2002 ME 149

**Randy S. SMITH o/b/o Kate L.**

v.

**Wayne HAWTHORNE.**

Supreme Judicial Court of Maine.

Argued: April 4, 2002.
Decided: Sept. 5, 2002.

---

Paul J. Morrow, Esq. (orally), McCue Law Office, L.L.C., Hampden, for plaintiffs.

Charles W. Cox, Esq. (orally), Jude, Cox & Tardy, Newport, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Wayne Hawthorne appeals from the entry of a protection from abuse order entered against him in the District Court (Newport, *Murray, J.*). His appeal presents several questions regarding Maine's protection from abuse statute, 19–A M.R.S.A. §§ 4001–4014 (1998 & Supp. 2001), including whether a defendant can be found to have committed "abuse" by "attempting to place or placing another in fear of bodily injury," *id.* § 4002(1)(B), when the defendant did not verbally threaten or commit acts of violence against the victim. We answer this question in the affirmative and, finding no error, affirm the judgment.

## I.  BACKGROUND

[¶ 2] Randy S. Smith filed a protection from abuse complaint on behalf of his daughter Kate L., then age seventeen, against her stepfather, Wayne Hawthorne, on September 18, 2001. The complaint alleges that:

> Kate ... has had abuse in the past 2 weeks. Included is being kicked out of her house on 9–1–01. This includes many cases of being sworn at and tortured mentally. This also includes threatening notes left in her car at school after he kicked her out—Kate is presently being counceled [sic] at school.

Until September 1, 2001, Kate had resided with her mother and Hawthorne for seven years pursuant to a divorce judgment that awarded Kate's primary residential care to her mother and rights of parent-child contact to Smith. The court (*MacMichael, J.*) granted a temporary order for protection. The court (*Murray, J.*) subsequently held

a hearing on October 4, 2001, and granted a final order for protection from abuse the same day.

[¶ 3] During the seven years that Kate resided with her mother and Hawthorne, Hawthorne regularly yelled and subjected Kate to foul language. The frequency of this behavior intensified on August 31 and September 1, 2001. On three separate occasions during these two days, Hawthorne directed foul language and yelled at Kate first at a restaurant, next at a Wal–Mart store, and finally at their residence. Although the arguments at the restaurant and the Wal–Mart store were over trivial matters, both Kate and Hawthorne testified that the underlying reason for all three of the arguments was a disagreement related to Kate's sexuality.

[¶ 4] Kate testified that sometime between 9:30 and 10:00 in the evening of September 1, Hawthorne kicked her out of the house after a heated argument. After telling her to leave, Hawthorne took her car keys from her claiming that she was too upset to drive. Hawthorne testified that he then called Smith to pick up Kate. Once outside, Kate found herself without a coat on a cold evening. She got into a car while waiting for Smith to arrive. Approximately twenty minutes later, Hawthorne and Kate's mother came outside, and following another argument and after telling her to "have a good life," he kicked another car, which Kate considered hers and which was parked in close proximity to the car she was sitting in. Kate was shaking and crying, and she was scared of Hawthorne because she "didn't know what he was gonna do next" and "didn't know if he

was gonna come try to get [her]."[1] At that point, she testified that she locked the car she was sitting in. When Smith arrived, Hawthorne gave him the car keys, and Smith and Kate left.

[¶ 5] During the following two weeks, Hawthorne left three offensive notes on the windshield of Kate's car while it was parked at her school. The first note begins: "Some people don't take kindly to being [expletive deleted] over. So far this is between you and me." The second note threatened that Kate should "wise up" or he would post a written notice at her school warning the students and faculty that she suffers from a sexually transmitted disease (a claim that Kate and her father testified is false) and reveal her sexual preferences. A third note, although conciliatory in part, threatened that Hawthorne and Kate's mother were "considering having you [ (Kate) ] legally and permanently severed as a daughter. Don't be surprised if you are served to appear in an action." Kate, her father, and her school counselor all testified that Kate believed her step-father's anger towards her was escalating and that she was very scared of him.

[¶ 6] At the end of the trial, the court stated:

> I have listened carefully to the evidence here. The conduct of the defendant with respect to the notes is despicable. I think it's hateful and immature behavior, but I don't think it meets the definition of abuse under the statute.... [B]ut I do find that the defendant did place Kate ... in fear of bodily injury

---

1. Kate responded to the court's questions as follows:
   Court: I have one question. Why did you lock the door?
   Witness: Because I was scared, and I didn't know what he was gonna do.
   Court: Scared of what?
   Witness: Him.

   Court: Can you be more particular about it?
   Witness: Um, I didn't know—I mean, when he kicked my car, that just showed me that I know, I mean, he kicked it and it just scared me. I know, I didn't know if he would do anything to me ....

... through a course of conduct ... including, among other things, arguments and yelling in public places, heated arguments ... in the house, telling her that she had to leave ... right then, immediately, yet taking keys from her, and even believing the defendant's testimony that 20 minutes later at that time he was still so angry that he had to vent to kick the car—and I do find that Kate ... was in reasonable fear of whether he'd come after her next. I do think she locked the doors, and I think that is ... objective ... or an active act, demonstrating ... that she did have the fear that she talked about, and therefore, for that particular ... incident, I am finding that the abuse occurred, and I am going to issue the order for protection.

The court entered an order for protection from abuse, making her father's residence Kate's primary residence and relieving him of his child support obligation "unless Kate ... resumes residency with [her mother]." The court ordered that Hawthorne have no contact, direct or indirect, with Kate.

[¶ 7] Hawthorne filed a motion for findings of fact and conclusions of law, which the court denied on October 11, 2001, stating that it had made its findings of fact on the record at the conclusion of the hearing. On its own initiative, two days later, the court amended its order to address the child support: "the suspension of [the father's] child support obligation is TERMINATED effective [the next day] and [the father] must file the appropriate Motions in the Family Court matter ... if he wishes to be relieved of his child support obligations and/or wishes other action with respect to child support."

[¶ 8] Hawthorne filed a timely notice of appeal and also moved to amend the judgment because Kate's mother was supposed to have primary custody of Kate pursuant to a divorce judgment. The court denied the motion, stating that

> [t]he 10–4–01 order is not deemed by the court to constitute a custody award, but instead addressed child support. Child support was readdressed in the 10–11–01 order. While the practical effect of the 10–4–01 order might or might not be that the child lives/lived someplace other than with mother, neither custody nor primary residence was changed by the 10–4–01 order.

## II. ISSUES

[¶ 9] On appeal Hawthorne contends that the court erred by (1) finding abuse based on conduct not alleged in the complaint; (2) finding that Kate had a reasonable fear of bodily injury as required by 19–A M.R.S.A. § 4002(1)(B); (3) failing to consider whether his actions were justified under the parental control justification defense; and (4) awarding Kate's primary residence to Smith even though Kate's mother was not a party to the action.

## III. DISCUSSION

### A. Adequacy of the Complaint

■ [¶ 10] Hawthorne contends that the court's finding of abuse was not based on the conduct alleged in the complaint, which "focused primarily upon several notes Mr. Hawthorne left for Kate ... *after* she moved out." He argues that the statute, which authorizes a summary proceeding, must be strictly construed to require notice to a defendant of the allegations against him. He contends that he lacked adequate notice of the claim against him because the complaint did not allege that he placed Kate in fear of bodily injury and did not describe the car incident. Smith asserts that the complaint was adequate pursuant to current notice pleading practice.

[¶ 11] The protection from abuse statute provides that a complaint must allege the abuse that is the basis for the complaint. 19–A M.R.S.A. § 4005(1) (1998) ("An adult who has been abused by a family or household member may seek relief by filing a complaint alleging that abuse."). Pleading practice in Maine requires that a claim for relief include "a short and plain statement of the claim showing that the pleader is entitled to relief." M.R. Civ. P. 8(a). Courts construe pleadings "to do substantial justice." M.R. Civ. P. 8(f). "[T]he purpose of the complaint is to provide the defendant with fair notice of the claim against him." *Richards v. Soucy*, 610 A.2d 268, 270 (Me. 1992) (internal quotation marks omitted).

[¶ 12] The court's finding of abuse was based upon a course of conduct involving verbal abuse and the September 1, 2001, incident, both of which were cited in the complaint. The complaint did, therefore, apprise Hawthorne of the gravamen of Smith's claim. Construing the complaint to do substantial justice, we conclude that Hawthorne had fair notice of Smith's allegation against him.

B. Finding of Reasonable Fear of Bodily Injury

[¶ 13] The protection from abuse statute's definition of abuse includes "[a]ttempting to place or placing another in fear of bodily injury through any course of conduct, including, but not limited to, threatening, harassing or tormenting behavior." 19–A M.R.S.A. § 4002(1)(B). Hawthorne does not challenge the court's finding that his course of conduct constituted "threatening, harassing or tormenting behavior" under section 4002(1)(B). He contends, however, that the court was unjustified in finding that Kate was in fact in fear of bodily injury because "[t]here is not a single incident in the seven years of living together wherein [he] threatened to use or did use physical force on any per-son," and that kicking the car could not give rise to a finding that Kate had a reasonable fear of bodily injury. According to Hawthorne, Kate's testimony that she was afraid because she did not know what he would do next differs from a reasonable fear that he might inflict bodily injury upon her.

[¶ 14] Smith contends that the record, which includes circumstantial evidence of a course of conduct by Hawthorne, supports the court's finding that Kate was in reasonable fear of bodily injury. According to Smith, the evidence demonstrated that from the evening of August 31 to the next evening Kate's conflict with Hawthorne was escalating and was abusive.

[¶ 15] Our function in reviewing the trial record is not to draw our own factual inferences and conclusions. Rather, our review of factual findings is limited to an investigation of the record to determine whether competent evidence exists to support the trial court's factual conclusions. *Stickney v. City of Saco*, 2001 ME 69, ¶ 13, 770 A.2d 592, 600. "The 'clearly erroneous' standard is not based merely on the trial court's ability to judge the demeanor and credibility of live witnesses, but also on a recognition of the trial court's particular expertise in fact finding and its proper institutional role." *Casco N. Bank v. JBI Assocs., Ltd.*, 667 A.2d 856, 859 (Me.1995).

[¶ 16] The deferential standard of "clear error" is particularly appropriate in actions for protection from abuse where the trial court's ability to observe the witnesses invariably plays a part in its assessment of the impact a particular person's words and actions had upon another person. Appellate review is naturally limited by the written record's inability to fully convey each witness's appearance, body language, stature, speech patterns, degree of eye contact, and numerous other non-

verbal cues. The clearly erroneous standard requires us to be mindful of this limitation when, as here, we review a trial court's reasonableness determination in connection with the subjective fear experienced by a child.

■■ [¶ 17] There was competent evidence in the record supporting the court's conclusion that Hawthorne's conduct, culminating with his kicking Kate's car "in fact" placed Kate in fear of bodily injury. She testified it made her "scared," that she "didn't know what he was gonna do next," and that she "didn't know if he was gonna come try to get [her]." Additionally, as the court concluded, her locking the doors of the car was an outward manifestation of her fear. A fact finder may draw reasonable inferences from circumstantial evidence that a victim was put in fear. *State v. Marden*, 673 A.2d 1304, 1312 (Me.1996) (fact finder may draw reasonable inferences from circumstantial evidence that victim was put in fear without direct evidence of victim's fear).

■ [¶ 18] The court's findings also reflect that it recognized that Kate's fear needed to be reasonable for there to be "abuse." The testimony of Kate, her father, and Kate's school counselor provided competent evidence supporting the finding that Kate's fear of bodily injury from Hawthorne was reasonable. Once Hawthorne physically struck Kate's car, it was objectively reasonable for her to fear that he might direct his escalating anger and physical aggression toward her. The Legislature recognized that domestic violence is often manifested in the form of "a pattern of escalating abuse" when it enacted

the protection from abuse statute. 19–A M.R.S.A. § 4001(1) (1998).[2] In addition, physical aggression toward inanimate objects—manifested here by Hawthorne kicking Kate's car—is often a precursor to violence between household members. *See* Bruce J. Winick, *Applying the Law Therapeutically in Domestic Violence Cases*, 69 UMCK L. REV. 33, 54–55 (2000) (listing "destruction of the victim's property" as a risk factor that correlates with future abusive behavior) (citing Janet A. Johnson et al., *Death by Intimacy: Risk Factors for Domestic Violence*, 20 PACE L. REV. 263, 282–83 & n. 89 (2000)). Both the escalating nature of Hawthorne's anger and his display of physical aggression towards Kate's car support the conclusion that Kate's fear of bodily injury was, under all of the circumstances, reasonable.

[¶ 19] As the trier of fact, the court was not obliged to accept Hawthorne's characterization of the events.[3] Indeed, the trial court was justified in rejecting most or all of Hawthorne's characterization of his actions based upon its separate finding that his written notes to Kate demonstrated "immature and hateful behavior." Similarly, the fact that there was no evidence that Hawthorne threatened to use or used physical force against Kate, on this or any prior occasion, does not compel the conclusion that there was no "abuse."

[¶ 20] Our protection from abuse statute recognizes that if a defendant engages in a course of conduct that is "threatening, harassing or tormenting," the conduct can cause the victim to be placed in fear of bodily injury even if the defendant has not verbally threatened violence or committed

2. The protection from abuse statute was enacted in recognition that domestic abuse can take the form of "a pattern of escalating abuse, including violence ... creating an atmosphere that is not conducive to healthy childhood development." *Id.* § 4001(1) (1998).

3. The court's findings reflect that it rejected Hawthorne's claims that he did not kick Kate out of the home, but, rather, that she decided to leave; that he took her car keys out of concern for her safety; and that he wrote the notes because he was concerned for Kate.

actual acts of violence against the victim. *See* 19–A M.R.S.A. § 4002(1)(B). We conclude that the trial court's finding that Kate reasonably feared bodily injury as a result of Hawthorne's course of conduct is supported by competent evidence in the record.

### C. Parental Control Justification Defense

[¶ 21] Hawthorne contends that the court should have applied the parental control justification defense, established in 17–A M.R.S.A. § 106(1) (1983),[4] which recognizes a parent's limited privilege to apply a reasonable degree of force necessary to prevent or punish a child's misconduct. *In re Dorothy V.*, 2001 ME 97, ¶ 7, 774 A.2d 1118, 1121 (citing *State v. Wilder*, 2000 ME 32, ¶ 44, 748 A.2d 444, 455). Hawthorne also contends that even if the parental control justification defense does not apply by operation of statute, it must nonetheless be considered because it arises from a parent's fundamental liberty interest in familial relationships. Smith responds that the defense does not apply in this action because the protection from abuse statute specifically provides that the defense applies to actions premised upon section 4002(1)(A) (abuse in the nature of "[a]ttempting to cause or causing bodily injury or offensive physical contact, including sexual assaults"), but does not provide that it applies to actions premised upon section 4002(1)(B) (abuse in the nature of "[a]ttempting to place or placing another in fear of bodily injury through any course of conduct"). 19–A M.R.S.A. § 4002(1)(A) & (B).[5]

[¶ 22] Although Hawthorne argued at the conclusion of the trial that the court should consider his actions in light of his role as a step-parent in determining whether his conduct constituted "abuse," at no time did he raise the parental control justification defense or assert that it applied as a matter of either statutory or constitutional law. We do not, therefore, reach this issue because Hawthorne failed to present it to the trial court and, accordingly, it has not been properly preserved for appellate review. *KeyBank Nat'l Ass'n v. Sargent*, 2000 ME 153, ¶ 14, 758 A.2d 528, 533.

### D. Award of Custody

[¶ 23] Hawthorne contends that the court lacked the authority to alter Kate's primary residence because her mother was not a party to the action. He contends that the statutory authority to award parental rights and responsibilities exists only when all interested parties are parties to the proceeding. Smith contends that the relief section of the protection

---

4. Section 106(1) provides:

> A parent, foster parent, guardian or other similar person responsible for the long term general care and welfare of a person is justified in using a reasonable degree of force against such person when and to the extent that he reasonably believes it necessary to prevent or punish such person's misconduct. A person to whom such parent, foster parent, guardian or other responsible person has expressly delegated permission to so prevent or punish misconduct is similarly justified in using a reasonable degree of force.

*Id.* § 106(1).

5. Section 4002(1)(A) & (B) provides:

1. **Abuse.** "Abuse" means the occurrence of the following acts between family or household members or by a family or household member upon a minor child of a family or household member:

A. Attempting to cause or causing bodily injury or offensive physical contact, including sexual assaults under Title 17–A, chapter 11, except that contact as described in Title 17–A, section 106, subsection 1 is excluded from this definition;

B. Attempting to place or placing another in fear of bodily injury through any course of conduct, including, but not limited to, threatening, harassing or tormenting behavior;

*Id.* § 4002(1)(A) & (B).

from abuse statute permits the temporary award of custody to Smith. We have not previously considered the question of whether a court may award temporary custody of a child to a parent in a protection from abuse action in which the child's custodial parent is not a party to the action.

[¶ 24] Because Kate turned eighteen in April 2002, the question of the allocation of responsibility for her primary residential care as between her mother and father is no longer at issue. An issue is moot if the practical effects that flow from resolving the issue are insufficient to justify the application of limited judicial resources. *Sordyl v. Sordyl*, 1997 ME 87, ¶ 4, 692 A.2d 1386, 1387. An issue that has become moot is nonjusticiable. *Id.* We conclude that the question of whether the court had properly determined Kate's primary residential care even though her mother was not a party to the action is moot because there are insufficient practical effects flowing from any decision we would make regarding that issue.

The entry is:

Judgment affirmed.

DANA, J., dissenting.

[¶ 25] I respectfully dissent.

[¶ 26] I agree with the trial court that Hawthorne's foul language and "despicable" notes did not amount to "abuse" pursuant to 19–A M.R.S.A. § 4002(1). I disagree that his frustrated and angry assault on an inanimate object (which some caring professionals have recommended as a constructive way to channel emotions) would have "reasonably" placed the seventeen and a half year old Kate "in fear of bodily injury" because it is undisputed that in the seven years she lived under his roof Hawthorne had never once struck her. 19–A M.R.S.A. § 4002(1)(B).

[¶ 27] When the next parent speaks harshly and pounds a table or stomps a foot, I fear this precedent may be used to separate another family for a period of up to two years.