**CASCO NORTHERN BANK**

v.

**JBI ASSOCIATES, LIMITED, et al.**

Supreme Judicial Court of Maine.

Argued Sept. 22, 1995.

Decided Nov. 30, 1995.

Thomas Schulten (orally), Andrew A. Cadot, Perkins, Thompson, Hinckley & Keddy, Portland, for Appellant.

Douglas A. Grauel (orally), Charles H. Abbott, Skelton, Taintor & Abbott, Auburn, for Appellees.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

Defendant JBI Associates, Ltd. (Associates) appeals from an order entered in the Superior Court (Cumberland County, *Bradford, J.*) on the motion of defendants Jackson Brook Institute, Inc. (JBI) and Community Care Systems, Inc. (CCSI), disqualifying attorneys Frederick Goldstein and Leonard Singer from representing Associates in the underlying declaratory judgment action brought by Casco Northern Bank (Casco). We conclude that the trial court did not clearly err in finding a substantial relationship between the current litigation and attorney Goldstein's prior representation of the parties. With respect to attorney Singer, we find no error in the application of the imputed disqualification rule. Therefore, we affirm the order.

To understand the issues at bar it is necessary to set forth the relationships between the parties. CCSI develops health care facilities throughout New England. In 1979, CCSI proposed to build the Jackson Brook Institute, a mental health facility, in South Portland. The law firm of Csaplar & Bok had been corporate counsel for CCSI since 1978. Goldstein was a partner in the firm and was head of the tax department. Goldstein devised a plan through which CCSI could develop the hospital while minimizing its tax burdens and legal liabilities. The plan included the creation of two new entities: Associates, which would raise the money to develop and own the hospital, and JBI, which would lease the property from the owner and operate the hospital. Associates was formed as a limited partnership, with CCSI as the general partner. JBI was created as a wholly-owned corporate subsidiary of CCSI. Frederick Thatcher was, at all relevant times, the chief executive officer of CCSI and had the power to contract on behalf of all three entities.

In May of 1983, prior to construction, the hospital facility was leased from Associates to JBI. CCSI agreed to guarantee JBI's obligations under the lease. Plaintiff Casco then made a loan to Associates to build and develop the hospital. Associates assigned the lease and CCSI's guaranty to Casco. All three entities—Associates, JBI and CCSI—have obligations to Casco by virtue of the financing arrangements. All of the documents produced by the three entities were signed by Thatcher, as President of CCSI. Attorneys from Csaplar & Bok represented CCSI and its affiliates in these transactions. At about this same time, attorney Singer joined the firm of Csaplar & Bok.

CCSI sold its partnership interest in Associates in 1985, and from that point on its interests were no longer aligned with either CCSI or JBI. Csaplar & Bok ceased its representation of CCSI some time in the mid–1980's. In 1990, a dispute arose between Associates and JBI regarding JBI's failure to perform certain lease obligations. Goldstein, who at that time was withdrawing from the firm of Csaplar & Bok, participated in the negotiations between Associates, CCSI, and JBI from 1990–1991. There is disagreement over Goldstein's role: Associates argues he acted as their counsel only, while CCSI and JBI argue that he was a 'mediator', acting on behalf of all three entities.

■ In November of 1993, Casco filed this action against Associates, JBI, and CCSI alleging violations of the loan agreement and of the lease agreement. In March of 1994, Associates cross-claimed against CCSI and JBI alleging violations of the lease agreement, and demanded indemnification and attorney fees incurred in defending the suit. Associates' answer and cross-claim was filed by Goldstein and Singer.[1] In April of 1994, CCSI wrote to Goldstein requesting his withdrawal from representation of Associates, based on his prior representation of CCSI. JBI then moved to disqualify Goldstein and Singer.[2] The Superior Court granted the

---

1. Singer left Csaplar & Bok in September of 1990.

2. CCSI and JBI argue that Goldstein's prior work on the tax planning for the venture implicated M.Bar. R. 3.4(d)(1)(i):

motion to disqualify, finding that (1) the prior representation was substantially related to the present litigation and therefore Goldstein was disqualified, (2) CCSI had not waived its right to object to the adverse representation, and (3) Singer was disqualified as a result of his prior association with Csaplar & Bok. Associates then filed this appeal.[3]

### Standard of Review

■ The standard of review for orders disqualifying or refusing to disqualify counsel is highly deferential. *See Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983) citing *Gas–a–Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1325 (9th Cir.1976) (such an order "will not be disturbed if the record reveals any sound basis for the district court's action."); *Koch v. Koch Indus.*, 798 F.Supp. 1525, 1530 (D.Kan.1992) ("Within the inherent supervisory powers of the court is the discretionary authority to control attorneys. Consequently, motions to disqualify counsel are committed to the court's sound discretion."). Although the movant has the burden of showing the grounds for disqualification, producing more than "mere speculation" and sustaining "a reasonable inference of a[n ethical] violation," doubts should be resolved in favor of disqualification. *Koch*, 798 F.Supp. at 1530–1531 (citations omitted).

■ We review the trial court's findings of fact under the familiar "clearly erroneous" standard. *See Pongonis v. Pongonis*, 606 A.2d 1055, 1057–58 (Me.1992). Our standard of review is not altered by the fact that the trial court based its findings on written affidavits and documentary evidence; we will not "substitute our judgment for that of the [trial] court" and review the evidence de novo. *Anderson v. Kennebec River Pulp & Paper Co.*, 433 A.2d 752, 754 (Me.1981), citing *Bowman v. Dussault*, 425 A.2d 1325 (Me. 1981). The "clearly erroneous" standard is not based merely on the trial court's ability to judge the demeanor and credibility of live witnesses, but also on a recognition of the trial court's particular expertise in fact finding and its proper institutional role. *In re Estate of Tully*, 545 A.2d 1275, 1277–78 (Me. 1988).

■ Although the Supreme Judicial Court is ultimately responsible for the promulgation and enforcement of the Maine Bar's ethical rules of conduct, in our appellate capacity we defer to the trial court's application of the rules. It is the trial court's function to determine factually whether the prior and present representations are "substantially related." In addition to being well versed in the process of litigation, the trial court is also fully apprised of the parties and issues of the specific case before it. This intimate knowledge of the case helps it to determine not only if the issues are "substantially related", but also assists it in detecting any abuse of the ethical rules. A motion to disqualify opposing counsel is capable of being abused for tactical purposes, and courts are justifiably wary of this type of strategic maneuvering. If disqualification does not serve the purposes supporting the ethical rules, it can only serve to provide the movant with a "brief, tactical advantage, a result that would debase the rules of professional conduct and subvert, not advance, the public interest they serve." *In re Ferrante*, 126

---

**(d) Conflict of interest: Successive Representation**

(1) *Interests of Former Clients.*

(i) *Except as permitted by this rule, a lawyer shall not commence representation adverse to a former client without that client's informed written consent if such new representation is substantially related to the subject matter of the former representation or may involve the use of confidential information obtained through such former representation.*

CCSI and JBI also argue that Singer's employment with Csaplar & Bok, at the same time that Goldstein performed the tax planning, implicates M.Bar R. 3.4(b)(3)(i):

**(b) Conflict of Interest: General Provisions.**

(3) *Imputed Disqualification*

(i) *Except as otherwise provided in these rules, if a lawyer is required to decline or withdraw from representation under these rules for reason other than health, no partner or associate, and no lawyer affiliated with the lawyer or the lawyer's firm, may commence or continue such representation.*

3. "[A]n order granting or denying a motion to disqualify an attorney is immediately appealable, as a 'death knell' exception to the final judgment rule." *Adam v. Macdonald Page & Co.*, 644 A.2d 461, 462 n. 5 (Me.1994) citing *Cook v. Cook*, 574 A.2d 1353, 1354 (Me.1990).

B.R. 642, 649 (Bankr.D.Me.1991), cited with approval in *Adam v. Macdonald Page & Co.*, 644 A.2d 461 (Me.1994), (discussed infra).

### *Macdonald Page and the "Substantially Related" Test*

 Interpretation and application of the rule against successive representation, embodied in M.Bar. R. 3.4(d)(1)(i), is controlled by our opinion in *Adam v. Macdonald Page & Co.*, 644 A.2d 461 (Me.1994). "In applying the first prong of M.Bar R. 3.4(d)(1), the trial court's determination that there is no substantial relationship between t[he present litigation and the prior representation] is factual and reviewable only for clear error." *Id.* at 462–63. In determining whether there is a "substantial relationship" between the prior and present representation, we adopted the test articulated by the Seventh Circuit in *Novo Terapeutisk Lab. A/S v. Baxter Travenol Lab.*, 607 F.2d 186, 195 (7th Cir.1979):

> Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Macdonald Page,* 644 A.2d at 463.

In the present case, the trial court reviewed affidavits from Singer and Goldstein, and also from Thatcher, the president of CCSI, plus copies of the lease agreement and the loan from Casco. There was ample evidence for the court to conclude that the work performed by Goldstein in setting up the two smaller entities, and devising the lease-back plan, was substantially related to the parties' respective duties under the lease and loan agreements. Considerations concerning corporate structure and tax planning are rarely completely unrelated to considerations of corporate liability and finance. We find no error in the trial court's conclusion that the prior representation was substantially related to the pending litigation.

 Associates argues in the alternative that the *Macdonald Page* test is inapplicable here, because there can be no expectation of keeping client confidences when one attorney or law firm represented three separate legal entities in a joint venture. Associates cites *Allegaert v. Perot,* 565 F.2d 246 (2d Cir.1977) in support of its position: "[B]efore the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Id.* at 250.

The *Allegaert* rule, however, has been strongly criticized in several jurisdictions and we decline to adopt it. Although it is true that CCSI could not have reasonably expected that Goldstein would keep any secrets from JBI or from Associates when he represented all three, the rule against subsequent adverse representation goes beyond simply protecting attorney-client communications. The rule addresses the reasonable expectations of the average client that his attorney, who is both counsellor and confidante, will remain loyal. The rule protects the integrity of the judicial system and the public's view of the legal profession; it is necessary to counteract the perception of attorneys as simply "hired guns", who can and do change sides at will, subject only to the highest bidder. *Accord, Koch,* 798 F.Supp. at 1534 ("[T]he prophylactic protection offered by [the rule against successive representation] extends beyond the preservation of confidential information. It also maintains public confidence in the system and, more importantly, safeguards a client's 'right to expect the loyalty of his attorney.' ... A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter.") (citations omitted). *See also, Rosman v. Shapiro,* 653 F.Supp. 1441, 1446 (S.D.N.Y. 1987) ("[T]he well-settled ethical principles that '[w]hen the interests of clients diverge and become antagonistic, their lawyers must be absolutely impartial between them, which ... usually means that he may represent none of them.' ") (citations omitted).

The rule against successive adverse representation protects all of these important concerns, and a broader rule would defeat other interests. If an attorney were barred from ever acting in an adversarial position to a former client, on any matter, this would restrict the public's freedom of choice in attorneys and would effectively prohibit attorneys from ever changing firms. In addition, such a rule would be subject to abuse by clients: a large, powerful corporation could hire every attorney in a community, each to perform some minute piece of work, and thus forever bar those attorneys from working on behalf of that corporation's adversaries. For these reasons, the rule against successive adverse representation requires that the movant satisfy at least one of the prongs of M.Bar R. 3.4(d)(1).

### Waiver

 Associates argues that, even if the attorneys *could* have been disqualified under *Macdonald Page,* CCSI and JBI waived their right to object to the representation by virtue of their two and one half year delay in raising the issue. M.Bar. R. 3.4(d)(1)(i) provides that a client may give explicit, written consent to adverse representation by his former attorney. In addition, a client may also implicitly waive the right to object to the adverse representation by an unreasonable delay in exercising that right. *See, In re Ferrante,* 126 B.R. at 648 (interpreting and applying M.Bar. R. 3.4(e), now 3.4(d)(1)(i)), citing *Trust Corp. of Montana,* 701 F.2d at 87. Because the rule against successive representation, however, is designed to protect the judiciary and the public interest as well as to protect the individual interests involved, "[c]laims of waiver must be viewed unsympathetically." *In re Ferrante,* 126 B.R. at 648. "Delay alone will not generally be taken as waiver," *Id.,* rather, the movant and former client must have exhibited a "thorough, knowing and continuing acceptance" of the adverse representation. *Id.* at 649. The reasonableness of the delay is fact-specific. The trial court made note of the dispute regarding Goldstein's role in the 1990 negotiations between the parties: whether Goldstein was attorney for the Associates only, or whether he acted as a media-tor on behalf of all parties. There was sufficient competent evidence presented to the court to permit a finding that CCSI and JBI were unaware of Goldstein's adverse representation until March of 1994 and that therefore there was no waiver of that clients' right to object.

### Imputed Disqualification.

 Associates objects to the court's application of M.Bar. R. 3.4(b)(3)(i) to disqualify Singer by virtue of his prior association with Csaplar & Bok. Associates argues that the trial court's application of the imputed disqualification rule is too rigid. Associates asks that we treat the rule of imputed disqualification as creating a rebuttable presumption, allowing attorneys like Singer to produce evidence that they were not exposed to any confidential information regarding the prior representation. Associates argues that this modification of the rule is necessary to prevent absurd applications that would severely limit the ability of clients to choose counsel and the ability of attorneys to change law firms.

The language of M.Bar. R. 3.4(b)(3)(i) is clear: because Goldstein has been disqualified under one of the rules, "*no* lawyer affiliated with the lawyer or the lawyer's firm, may commence or continue such representation." (emphasis added). There is no room in that language allowing Singer to rebut a presumption that he was privy to privileged, confidential information. In addition, the other reasons supporting Rule 3.4(d)(3)(i)—client's expectations of loyalty, public perception of the legal profession, and preservation of the integrity of the judiciary—would require Singer's disqualification even if he were allowed a rebuttal.

The entry is:

Judgment affirmed.

All concurring.