2008 ME 138

**ESTATE OF Anna L. MARKHEIM,
by G. Charles SHUMWAY II,
Special Administrator**

v.

**Ryan MARKHEIM et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 29, 2008.
Decided: Sept. 4, 2008.

Dylan Smith, Esq., Verrill Dana, LLP, Portland, ME, for Ryan Markheim and Heather Markheim.

G. Charles Shumway, II, Esq., Childs, Rundlett, Fifield, Shumway & Altshuler, Portland, ME, for the Estate of Anna L. Markheim.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

GORMAN, J.

[¶ 1] Ryan Markheim and Heather Markheim appeal from a decision of the Superior Court (York County, *Fritzsche, J.*) denying their motion to disqualify G. Charles Shumway II, Esq., from representing the Estate of Anna L. Markheim in this action to collect a debt allegedly owed to the Estate by Ryan and Heather. Ryan and Heather contend pursuant to M. Bar R. 3.4(d)(1)(i) that Shumway should have been disqualified because he previously represented them in litigation that was substantially similar and in which he was privy to confidential information. Although the Markheims concede that the appeal is interlocutory, they contend that the appeal fits within the death knell exception to the final judgment rule. We agree, and vacate the order denying the motion to disqualify.

## I. FACTUAL BACKGROUND

[¶ 2] Chaim Markheim allegedly engaged in a series of fraudulent transactions in California, and purportedly shared the proceeds of those transactions with his wife, Anna Markheim, and to a lesser extent with his son Ryan and daughter-in-law Heather Markheim. Chaim and Anna divorced in 2003. Chaim has reportedly fled the country, and Anna died in 2006.

[¶ 3] In 2001, Anna and Chaim gave Ryan and Heather $50,000 toward the pur-chase and renovation of a home in Saco. Anna also lent Ryan and Heather $70,000 towards the purchase of the property. Shumway claims that Anna, Ryan, and Heather had an agreement that the $70,000 would be repaid to Anna when the house was eventually sold. Anna was a grantee on the deed to the property along with Ryan and Heather.

[¶ 4] In 2004, a committee of unsecured creditors of a bankrupt company called Helionetics, Inc., brought suit in Maine against Chaim and Anna Markheim in an attempt to collect a $5 million judgment Helionetics had secured in California against Chaim. The committee alleged that Chaim had fraudulently transferred at least $2 million to Anna. Shumway represented Anna in that lawsuit. The Helionetics creditors ultimately added Ryan and Heather as defendants, seeking any funds Chaim may have fraudulently transferred to them, including the funds given and lent to them to buy the house in Saco. Shumway represented Ryan and Heather in that lawsuit for a time, and actually prepared Ryan for and represented him at his deposition. At the deposition, Ryan was questioned about his purchase of the house, including the $70,000 loan from Anna. Eventually, Ryan and Heather retained another attorney and entered into a settlement with the Helionetics creditors.

[¶ 5] During the Helionetics litigation, Ryan and Heather refinanced the Saco house and used part of the proceeds to pay Shumway for fees incurred by Anna. They contend this was done at Shumway's suggestion because Anna could no longer fund her defense. Shumway asserts it was their idea to mortgage the house, but acknowledges that he gave them advice regarding the consequences of refinancing.

[¶ 6] Anna eventually settled with the Helionetics creditors, consenting to the en-

try of a $950,000 judgment against her. At the end of that litigation, Anna owed Shumway over $50,000 in legal fees.

[¶ 7] After Anna died in 2006, Ryan was appointed administrator of Anna's Estate. The Helionetics creditors filed a claim against the Estate in the amount of the consent judgment, and Shumway filed a claim against the Estate for his attorney fees. It was apparently contemplated that the Helionetics creditors' claim would be paid out of the proceeds from the Estate's main asset, real property that Anna owned in York County. The property was originally listed for $3,100,000, but has not sold, and is now listed for less than $1 million. Shumway therefore looked to other assets of the Estate to recover his attorney fee claim, specifically, the loan Anna made to Ryan and Heather to purchase the Saco property. When Ryan refused to pay the debt or sue himself or his wife on behalf of the Estate to recover the debt, Shumway petitioned the Probate Court to have Ryan removed and to have a special administrator appointed. The Probate Court granted the petition, and appointed Shumway special administrator for the limited purpose of collecting on any claims the Estate has against any person owing money to the Estate "pursuant to any mortgage, note or loan, whether secured or unsecured."

[¶ 8] "A special administrator appointed by order of the court in any formal proceeding has the power of a general personal representative except as limited in the appointment and duties as prescribed in the order." 18–A M.R.S. § 3–617 (2007). That power includes the power to "[p]rosecute or defend claims, or proceedings in any jurisdiction for the protection of the estate. . . ." *Id.* § 3–715(22).

[¶ 9] Shumway brought suit against Ryan and Heather in the Probate Court,[1]

listing himself, the Estate's special administrator, as plaintiff, to recover the $70,000 loan. The caption reads: *"ESTATE OF ANNA L. MARKHEIM, by G. CHARLES SHUMWAY II, Special Administrator v. RYAN MARKHEIM and HEATHER MARKHEIM."* The complaint is signed by Shumway for his law firm, and lists his bar number.

[¶ 10] The Markheims removed the action to Superior Court, and filed a motion to disqualify Shumway from acting as an attorney for the Estate in this action pursuant to M. Bar R. 3.4(d)(1)(i). That rule provides:

> Except as permitted by this rule, a lawyer shall not commence representation adverse to a former client without that client's informed written consent if such new representation is substantially related to the subject matter of the former representation or may involve the use of confidential information obtained through such former representation.

The trial court denied the motion, likening this case to one in which an attorney acts pro se to collect a debt owed to him, which is permissible under the Rule.

[¶ 11] The Markheims also filed a motion for sanctions against Shumway, which was denied, and a motion to remove him as special administrator, which was dismissed because it was outside the Superior Court's jurisdiction. Finally, the Markheims filed a motion requesting that the trial court report the issue of whether Shumway should have been disqualified to this Court pursuant to M.R.App. P. 24(c). They filed a timely notice of appeal before the court could rule on that motion.

## II. DISCUSSION

### A. Final Judgment Rule

[¶ 12] The Markheims concede that the order denying their motion to

---

1. From this point forward, "the Markheims," refers to Ryan and Heather Markeim.

disqualify is interlocutory. An appeal from an interlocutory order is "eligible for immediate review only if [it falls] within a judicially-created exception to the final judgment rule, including one of the three, well-established exceptions: the 'death knell' exception, the judicial economy exception, or the collateral order exception." *Passalaqua v. Passalaqua*, 2006 ME 123, ¶ 8, 908 A.2d 1214, 1217.

[¶ 13] The Markheims contend that the order denying their motion to disqualify fits within the "death knell" exception. "The 'death knell' exception allows an immediate appeal from an interlocutory order when substantial rights of a party will be irreparably lost if review is delayed until final judgment." *Id.* ¶ 9, 908 A.2d at 1217 (quotation marks omitted). "A right is irreparably lost if the appellant would not have an effective remedy if the interlocutory determination were to be vacated after a final disposition of the entire litigation." *Id.* (quotation marks omitted).

[¶ 14] The Markheims assert that M. Bar R. 3.4(d)(1)(i) is designed to protect both individual interests and the integrity of the judicial system. They argue that they should not be forced to defend claims prosecuted by an attorney who not only represented them in a substantially related matter, but also obtained confidential information that he can now use to his advantage.

[¶ 15] We have routinely held that an order *granting* a motion to disqualify an attorney is immediately appealable. *Hurley v. Hurley*, 2007 ME 65, ¶ 6, 923 A.2d 908, 910 (stating "We have determined that disqualifying an attorney involves a disadvantage and expense that cannot be remedied after the conclusion of the case." (quotation marks omitted)); *Casco N. Bank v. JBI Assocs., Ltd.*, 667 A.2d 856, 859 n. 3 (Me.1995) (determining that the order granting the motion to disqualify

was immediately appealable pursuant to the death knell exception).

[¶ 16] We have addressed the issue of whether an order *denying* a motion to disqualify is likewise immediately appealable on two prior occasions. Recently, in a divorce action, we stated summarily that the appeal from an order denying a motion to disqualify fits within the death knell exception because the party seeking disqualification stood to irreparably lose substantial rights absent an immediate appeal. *Butler v. Romanova*, 2008 ME 99, ¶ 10, 953 A.2d 748, 750. We ultimately affirmed the denial of the motion to disqualify in that case because the husband's only contact with the wife's attorney was a phone call to her firm making an inquiry about representation, and no attorney-client relationship had been formed. *Id.* ¶¶ 11–12, 953 A.2d at 750–51.

[¶ 17] In *Tungate v. MacLean–Stevens Studios, Inc.*, MacLean–Stevens moved to disqualify the plaintiffs' attorney in a class action lawsuit, pursuant to M. Bar R. 3.4(g)(1)(i), 3.5(b)(1), and 3.4(f)(1), which prohibit an attorney from beginning a representation when he or a member of his firm will be a witness, or when he has a financial interest in the outcome. 1997 ME 113, ¶ 3, 695 A.2d 564, 564–65. The motion was based on the allegation that the attorney and his wife would likely be witnesses and were members of the class. *Id.* After the attorney and his wife waived their membership in the class and any potential award, and the representative plaintiff gave consent to the continued representation, the trial court denied the motion to disqualify. *Id.*

[¶ 18] MacLean–Stevens appealed, contending that the interlocutory order denying the motion to disqualify was immediately appealable. *Id.* ¶ 4, 695 A.2d at 565. We disagreed, expressly distinguishing the

case in which an attorney is disqualified from one in which the motion to disqualify is denied. *Id.* We also noted, however, that the case did not involve prior representation or the acquisition of confidential information, so there was no likelihood of irreparable harm or extraordinary circumstances. *Id.* ¶ 5, 695 A.2d at 565.

[¶ 19] Neither *Butler* nor *Tungate* answers the question presented in this case: whether the denial of a disqualification motion brought pursuant to Rule 3.4(d)(1)(i), involving the potential use of confidential information and prior representation in a substantially similar matter, would cause the irreparable harm to substantial rights and, therefore, justify review before final judgment.

■ [¶ 20] Recognizing that motions to disqualify counsel are sometimes used "to delay proceedings, deprive the opposing party of counsel of its choice, and to harass and embarrass an opponent," we will undertake appellate review of decisions denying motions to disqualify before final

judgment only when the particular facts demonstrate that a party's substantial rights may be irreparably lost if review is delayed until final judgment.[2] *Koller v. Richardson–Merrell,* 737 F.2d 1038, 1051 (D.C.Cir.1984); *see also* Steven H. Goldberg, *The Former Client's Disqualification Gambit: A Bad Move in Pursuit of an Ethical Anomaly,* 72 Minn. L.Rev. 227, 228 (1987). The Markheims have met this burden. Their petition to disqualify involves prior representation in a substantially similar matter during which confidential communications occurred, and the extent of that representation far exceeded the initial intake discussion addressed in *Butler.* In the affidavits they attached to the motion to disqualify, the Markheims provided specific examples of what Shumway learned as a result of the prior representation. If we refuse to exercise our discretion to decide this issue before trial, the confidences and privileged information revealed in the course of the proceedings would become part of the record.[3]

2. Federal courts undertake appellate review of orders denying motions to disqualify only upon certification pursuant to 28 U.S.C.S. § 1292(b) (2003), or by way of mandamus review. *See Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 378 n. 13, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); *see also* Leah Epstein, *A Balanced Approach to Mandamus Review of Attorney Disqualification Orders,* 72 U. Chi. L.Rev. 667 (2005). Many states follow the federal model by requiring permission or certification from the appellate court before that court will address the merits of an appeal from the denial of a disqualification motion. *See, e.g., Flores Rentals, LLC. v. Flores,* 283 Kan. 476, 153 P.3d 523, 526–27 (2007) (allowing appeal of disqualification orders by permission only); *Acierno v. Hayward,* 859 A.2d 617, 620 (Del.2004) (allowing interlocutory appeal of denial of disqualification motion by certification or writ of mandamus); *Richers v. Marsh & McLennan Group Assocs.,* 459 N.W.2d 478, 480–81 (Iowa 1990) (allowing interlocutory appeal from denial of disqualification order despite failure to request permission upon finding that order involves

substantial rights and will materially affect final decision); *Masiello v. Perini Corp.,* 394 Mass. 842, 477 N.E.2d 1020, 1022 (1985) (allowing interlocutory appeal of denial of disqualification motion by permission of Court of Appeals or single Supreme Court Justice).

3. In *Firestone,* the U.S. Supreme Court concluded that an order denying a motion to disqualify counsel is not immediately appealable because it is not effectively unreviewable on appeal after trial. 449 U.S. at 377, 101 S.Ct. 669. It rejected the appellant's arguments that the proceedings would be "stamped or shaped with the fruits of a breach of confidence or by acts or omission prompted by a divided loyalty" in the absence of a "concrete example of the indelible stamp or taint of which it warn[ed]." *Id.* at 366, 101 S.Ct. 669. The Court noted that it allows interlocutory appeals pursuant to the collateral order exception only when they involve "an asserted right the legal and practical value of which could be destroyed if it were not vindi-

[¶ 21]   Because the prior representation in question was in a substantially related matter and because confidences were disclosed, immediate appellate review is appropriate.   Waiting until after trial to review the denial order could cause harm to the Markheims that cannot be remedied after trial.

[¶ 22]   We therefore address the merits of the Markheims' appeal.

B.   Merits of the Appeal

[¶ 23]   The circumstances under which an attorney may accept a representation adverse to a former client are outlined in M. Bar R. 3.4(d)(1)(i).   The attorney must obtain that client's "informed written consent if such new representation is substantially related to the subject matter of the former representation or may involve the use of confidential information obtained through such former representation."   M. Bar R. 3.4(d)(1)(i).

[¶ 24]   Maine Bar Rule 3.4(d)(1)(i) "has two prongs, each of which provides an independent basis for disqualifying an attorney."   *Hurley*, 2007 ME 65, ¶ 7, 923 A.2d at 910.   As we explained in *Hurley*, "[u]nder the first prong, if the two matters are substantially related, the attorney is disqualified.   M. Bar R. 3.4(d)(1)(i).   Under the second prong, an attorney is disqualified if the current representation may involve the use of confidential information obtained in the former representation."   *Id.* (quotation marks omitted).

[¶ 25]   A three-part test is used to determine whether the prior and present representations are substantially related:
> [First], the trial judge must make a factual reconstruction of the scope of the prior legal representation.   Second, it

cated before trial."   *Id.* at 377, 101 S.Ct. 669 (quotation marks omitted).   In this case, the Markheims' allegations are sufficiently con-

must be determined whether it is reasonable to infer that the confidential information allegedly given would have been to a lawyer representing a client in those matters.   [Third], it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Id.* ¶ 9, 923 A.2d at 910–11 (quotation marks omitted).

[¶ 26]   "Under the alternative confidential information prong, if the attorney actually acquired confidential information that may be used in the present representation, the attorney is prohibited from representing the client in the present representation."   *Id.* ¶ 20, 923 A.2d at 912.

[¶ 27]   "The standard of review for orders disqualifying or refusing to disqualify counsel is highly deferential."   *Casco N. Bank*, 667 A.2d at 859.   The court's determination as to whether the two matters are substantially related is a factual determination that is reviewed for clear error.   *Id.* at 860.   A determination that the current representation may or may not involve the use of confidential information is reviewed de novo if the trial court construed the rule to permit an assumption that confidential communications were made.   *Adam v. Macdonald Page & Co.*, 644 A.2d 461, 463 (Me.1994).   However, if the trial court makes factual findings that confidential communications were made, then we review those findings for clear error.   *Hurley*, 2007 ME 65, ¶¶ 21, 22, 923 A.2d at 912–13.

[¶ 28]   With respect to the substantial similarity prong, the trial court found that "the prior representation of Ryan and Heather Markheim involved in part the $70,000 note and where the funds came

crete to support the conclusion that they will suffer the irreparable loss of substantial rights.

from." With respect to the confidential communications prong, the court stated that "it is more than reasonable to infer that some confidential information, which may or may not still be useful, was provided concerning the note and perhaps Ryan and Heather Markheim's personal and financial circumstances" that could be used in the current litigation. Based on these findings, the court concluded that a literal reading of Rule 3.4(d)(1)(i) would bar Shumway from representing the Estate. Despite that holding, the court likened this case to an action brought by an attorney to collect a fee, and determined that the representation did not violate the Rule.

[¶ 29] This lawsuit, however, differs from an action brought by an attorney to collect a fee. It is a suit brought against third parties to collect a debt allegedly owed *to the Estate of Anna Markheim,* and Shumway is acting in a representative capacity on behalf of the Estate both as special administrator and as the Estate's attorney. Although he may ultimately benefit from the successful prosecution of this case, it is not a direct suit against a client for legal fees. The Markheims already paid Shumway for the legal services he provided to them and had no reason to believe that the confidential information revealed during that relationship might later be used to their disadvantage.

[¶ 30] Based on the trial court's findings of both substantial similarity and confidential communications, the plain meaning of Rule 3.4(d)(1)(i) compels Shumway's disqualification. Application of the standards set forth in *Hurley* to the court's findings also leads us to the conclusion that Shumway must be disqualified.

[¶ 31] First, the scope of Shumway's prior representation of the Markheims involved substantially the same issues that comprise the Estate's action. Second, as the trial court correctly found, it is more

than reasonable to infer that confidential information was given to Shumway by the Markheims' when they discussed issues regarding the Helionetics lawsuit and refinancing the Saco house. *See Hurley,* 2007 ME 65, ¶¶ 12–16, 923 A.2d at 911–12. Third, the confidential information revealed to Shumway is relevant because it relates directly to defenses the Markheims will use in the current litigation.

[¶ 32] Finally, Shumway is independently disqualified pursuant to the second prong of the *Hurley* test because he received confidential information that is usable in the present case.

The entry is:

The order denying the motion to disqualify is vacated, and the case remanded for entry of an order disqualifying Attorney Shumway.