2009 ME 71

**FIBER MATERIALS, INC.**

v.

**Maurice SUBILIA et al.**

Supreme Judicial Court of Maine.

Argued: May 20, 2009.
Decided: July 16, 2009.

George T. Dilworth, Esq. (orally), M. Katherine Lynch, Esq., McCloskey, Mina & Cunniff, LLC, Portland, ME, for Maurice Subilia.

Michael A. Nelson, Esq. (orally), Joseph H. Groff III, Esq., Jensen Baird Gardner & Henry, Portland, ME, for Fiber Materials, Inc.

Panel: CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.*

Majority: CLIFFORD, LEVY, SILVER, MEAD, and GORMAN, JJ.

Concurrence: ALEXANDER, J.

MEAD, J.

[¶ 1] Fiber Materials, Inc. (FMI), commenced this action against its former president, Maurice Subilia, and others, alleging that Subilia defrauded FMI and deprived it of business opportunities by competing with FMI without its knowledge while he was still FMI's president. Subilia appeals from an order entered on the Business & Consumer Docket (*Humphrey, C.J.*) denying his motions to strike three paragraphs of FMI's complaint, and to disqualify FMI's attorneys. Subilia contends that the court was required to grant his motions because FMI improperly made use of a memorandum protected by attorney-client privilege that it discovered on his FMI-owned laptop computer. Because no exception to the final judgment rule ap-

* Saufley, C.J., sat at oral argument but did not participate in the development of the opinion.

plies, we dismiss this interlocutory appeal. We take the opportunity to comment, however, on the treatment of the memorandum by FMI's attorneys prior to the trial court having an opportunity to rule on issues raised by Subilia on his claim of privilege.

## I. BACKGROUND

[¶ 2] FMI, which is incorporated in Massachusetts, is a Maine-based company specializing in manufacturing advanced composite materials for government entities and private industry. Maurice Subilia served as its president from 1978 to 2007. During that tenure, Subilia was convicted of violating federal export control laws and fined $250,000. In the counterclaim in this case, Subilia asserts that FMI reimbursed him for the fine, as it was obligated to do, in the form of a payment classified as ordinary income. The classification of the payment resulted in significant tax liability, for which Subilia unsuccessfully sought additional reimbursement from FMI. Subilia sought legal advice concerning the indemnification issue from his daughter, who is an attorney admitted to practice in Maine. His daughter referred him to the law firm of Verrill Dana.

[¶ 3] In March 2006, Verrill Dana produced a three-page memorandum (the Verrill Dana memo), which discusses the pros and cons of the merits of Subilia's potential indemnification claim. The memo is stamped at the top of each page: "ATTORNEY/CLIENT PRIVILEGE CONFIDENTIAL WORK PRODUCT." It was e-mailed to Subilia's daughter, who in turn e-mailed it to her father at his FMI e-mail address.

[¶ 4] Subilia had a laptop computer issued to him by FMI, as well as a personal laptop. He used his FMI laptop daily at work, took it home with him, and took it on vacation. FMI's in-house counsel, Jennifer Beedy, an attorney admitted to prac-

tice in Maine, testified at a hearing that it was not a violation of FMI's computer policy for Subilia to use his laptop for personal purposes. FMI had in place a written "E–Mail and Computer Use Policy," originally promulgated in 1999 and reissued in 2006. Among its provisions were declarations that users have no expectation of privacy in anything they stored on the company's computer system, that they expressly waived any right of privacy to such material, and that FMI reserved the right to monitor anything on its computer network. As company president, Subilia participated in meetings explaining the policy to employees. In 1999 and again in 2006, Subilia signed an acknowledgement that he had read and agreed to comply with the policy. After the policy was enacted, Beedy recalled Subilia authorizing the monitoring of employee computers on one to three occasions.

[¶ 5] In April 2007, federal agents from Immigrations and Customs Enforcement, the FBI, and the IRS came to the FMI corporate offices to question Subilia regarding an investigation into whether he had bribed an Army official. Attorney Beedy initially attended the meeting at Subilia's request, but left when he indicated that the subject matter did not involve FMI, and the agents were equivocal about FMI's potential involvement. That evening, Subilia went home with his FMI laptop to find federal agents waiting with a search warrant. In executing the warrant, the agents took a mirror image of the laptop's hard drive.

[¶ 6] Two days later, Subilia resigned from FMI and left with the company's laptop. Attorney Beedy asked Subilia's secretary to get the laptop back. The secretary spoke to Subilia's wife, who, following what she described as "a big fight" with her husband, returned the laptop to FMI that afternoon. Beedy locked the laptop in a file cabinet. At some point,

Subilia's attorney requested access to the laptop; the request was refused.

[¶ 7] A few days after gaining custody of the laptop, unsure of FMI's involvement in the government investigation and knowing that federal agents had taken a mirror image of the laptop's hard drive, Beedy advised FMI's chairman, Walter Lachman, that they should examine it. Lachman agreed, and Beedy conducted a general, non-forensic search of the hard drive after obtaining Subilia's password from FMI's information technology department. She eventually found the Verrill Dana memo on the hard drive ("C:" drive) and read it at least twice.

[¶ 8] Because of the memo's content and markings, Attorney Beedy initially considered it to be privileged. In deciding what to do next, she contacted the ABA Ethics Search Service and spoke to an attorney, who sent Beedy materials to review. Beedy also consulted the Maine Bar Rules and spoke to an Assistant Bar Counsel, who said she would get back to Beedy. Attorney Beedy eventually concluded that there was no ethical prohibition against turning the memo over to FMI officials. Before obtaining an opinion from the Bar Counsel's Office, she took the laptop containing the memo to Massachusetts and turned it over to Lachman and another FMI attorney. Beedy testified that after she turned the laptop over to FMI officials, she received a message the same day from the Assistant Bar Counsel she had spoken to previously, saying "Call me back." Beedy did not return the call.

[¶ 9] In October 2007, FMI filed a six-count complaint against Subilia and the other defendants in the Superior Court, alleging fraud, breach of fiduciary duty, usurpation of business opportunities, interference with contractual relations, misappropriation and conversion, and violation of the Uniform Trade Secrets Act. Three paragraphs of the 131-paragraph complaint specifically refer to the Verrill Dana memo. The case was accepted for transfer to the Business & Consumer Docket. In July 2008, Subilia filed a two-count counterclaim, alleging that FMI failed to fully indemnify him for the criminal fine that he paid, and that it invaded his privacy in reading and publishing the Verrill Dana memo. FMI has pending a motion to dismiss the counterclaims, or be granted summary judgment.

[¶ 10] In November 2007, Subilia moved to strike the three paragraphs citing the Verrill Dana memo from the complaint, and to disqualify FMI's attorneys on the ground that they had gained an incurable tactical advantage from reviewing privileged information. FMI's response to the motions attached the full text of the disputed memo as an exhibit. At Subilia's request, the trial court ordered the memo sealed seven days later.

[¶ 11] Concluding that discovery in the case-in-chief could not proceed until the motions to strike and to disqualify counsel were resolved, the court held a testimonial hearing in October 2008. By written order, the court denied both motions, ruling that (1) the Verrill Dana memo was not a "confidential communication" under the circumstances presented, and thus not protected by attorney-client privilege;[1] and

---

1. The applicable rule provides:

   A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. . . .

   M.R. Evid. 502(b). In the context of determining whether a communication is protected by the privilege, the word "confidential" has a particular meaning:

   A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of

(2) there was therefore no basis on which to disqualify FMI's attorneys. This appeal followed.

## II. DISCUSSION

### A. Final Judgment Rule

■■■ [¶ 12] Ordinarily, the final judgment rule prevents a party from appealing a trial court's decision on a motion before a final judgment has been rendered. *U.S. Dep't of Agric., Rural Hous. Serv. v. Carter*, 2002 ME 103, ¶ 7, 799 A.2d 1232, 1234. A compelling rationale underlies the rule:

The final judgment rule prevents piecemeal litigation, and helps curtail interruption, delay, duplication and harassment; it minimizes interference with the trial process; it serves the goal of judicial economy; and it saves the appellate court from deciding issues which may ultimately be mooted, thus not only leaving a crisper, more comprehensible record for review in the end but also in many cases avoiding an appeal altogether.

*Griswold v. Town of Denmark*, 2007 ME 93, ¶ 16, 927 A.2d 410, 417 (quotation marks omitted).

[¶ 13] There are exceptions to the rule; Subilia advances three of them in support of his position that this interlocutory appeal should be heard: (1) the death knell exception, (2) the collateral order exception, and (3) the judicial economy exception. FMI asserts that no exception applies, and therefore this appeal should be dismissed.

### 1. Death Knell Exception

■■■ [¶ 14] The death knell exception applies "if substantial rights of a party will be irreparably lost if review is delayed until final judgment." *Carter*, 2002 ME 103, ¶ 12, 799 A.2d at 1235 (quotation marks omitted). A right is "irreparably lost if the appellant would not have an effective remedy if the interlocutory determination were to be vacated after a final disposition of the entire litigation." *Id.* "Put differently, where an interlocutory order has the practical effect of permanently foreclosing relief on a claim, that order is appealable." *Lewellyn v. Bell*, 635 A.2d 945, 947 (Me.1993) (quotation marks omitted). Cost or delay alone is insufficient to establish the irreparable loss of a right. *Dairyland Ins. Co. v. Christensen*, 1999 ME 160, ¶ 8, 740 A.2d 43, 45; *see* Alexander, *Maine Appellate Practice* § 304(a) at 203 (2008). Whether the exception is applicable in a particular case is a fact-specific question. *See Estate of Markheim v. Markheim*, 2008 ME 138, ¶ 20, 957 A.2d 56, 61 ("[W]e will undertake appellate review of decisions denying mo-

---

professional legal services to the client or those reasonably necessary for the transmission of the communication.

M.R. Evid. 502(a)(5).

Outside of this specific context, although they are often used interchangeably, the terms "privileged" and "confidential" have significantly different meanings. If a communication, written or oral, is privileged, then "disclosure cannot be required either in discovery proceedings or at trial." M.R. Evid. 502 Advisers' Note. If a communication is only confidential, the protection against compelled disclosure is not so absolute. For example, "[t]he work product rule gives a qualified protection to unprivileged information prepared in anticipation of trial, which can be overcome by a showing of substantial need. It has nothing to do with admissibility at trial." *Id.* If confidentiality is conveyed by statute, then "[m]erely because a matter is 'confidential' does not necessarily mean that it cannot be admitted in evidence in a proceeding between interested parties. If such material is proposed to be introduced, the court can make an appropriate protective order to safeguard against improper public disclosure and preserve the evidentiary value of the material for the parties. Only if the statutory provision contains a specific ban on evidentiary use of the material should the court treat it as a privilege and exclude the evidence." Field & Murray, *Maine Evidence* § 501.4 at 211–12 (6th ed. 2007).

tions to disqualify before final judgment only when *the particular facts* demonstrate that a party's substantial rights may be irreparably lost if review is delayed until final judgment." (emphasis added)).

■ [¶ 15] The death knell exception is not applicable on these particular facts because the contents of the Verrill Dana memo have already been widely disclosed. FMI's attorneys are in possession of it; indeed they have used it twice in filings with the trial court. The memo has been shown to several members of FMI's management hierarchy in addition to Walter Lachman. Federal law enforcement agencies have a mirror image of the hard drive containing the memo. Once the memo was attached as an exhibit to FMI's response to the motions to strike and disqualify, it was then served on eighteen other parties in addition to Maurice Subilia. Finally, the response containing the entire text of the memo was a matter of public record for seven days until the memo was sealed by the court.

■ [¶ 16] The death knell exception is available "only when the injury to the appellant's claimed right, absent appeal, would be imminent, concrete and irreparable." Alexander, *Maine Appellate Practice* § 304(a) at 203. For example, the exception may apply when a court orders a party to disclose information that the party seeks to keep confidential. *Id.* If such a party is denied the opportunity to have the matter reviewed on appeal prior to trial, the information will be disclosed and its secrecy forever lost. Here, for better or worse, the Verrill Dana memo's confidentiality has already been lost. If this appeal is dismissed and the case proceeds to trial, Subilia's position following a successful post-judgment direct appeal would be, in all essential respects, the same as if his motions are reviewed on appeal now. Following a successful direct appeal the three challenged paragraphs could be stricken from the complaint, FMI's attorneys could be disqualified, and a new trial could be held. No one would know of the memo's contents then that does not already know now.[2] The memo would be in the common position of any other piece of evidence suppressed or excluded in limine—known to exist but not usable at trial.[3]

[¶ 17] In the interim, the progression of this case could well illustrate the rationale underlying the final judgment rule. The case might settle, or Subilia might be found not liable following a trial. FMI could decide for strategic reasons not to offer the memo at trial, or, if offered, it might be excluded by the trial court on a ground other than privilege. Significantly, Subilia asserted his Fifth Amendment rights at his deposition and did not testify at the motion hearing. As a result, the trial court drew a negative inference against him pursuant to M.R. Evid. 513(a)[4] when ruling on the merits of his

2. At the motion hearing, Subilia's attorney told the trial court that Walter Lachman "[has] shown [the memo] to virtually every decision-maker at the company.... He made it available to so many people that it's now impossible for them to litigate without knowing ... there's no way to put that toothpaste back in the tube.... Even if the Court disqualifies Ms. Beedy and [FMI's attorneys], the harm will continue...."

3. Separate from the issue of admissibility of the memo at trial, Subilia argues that knowledge of the memo's contents gives FMI's at-

torneys unfair insight into his litigation strategy. However, disqualifying FMI's present litigation attorneys, who entered this dispute well after the widespread dissemination of the memo, would serve no purpose as the contents of the memo remain known to the FMI decision makers in any event.

4. M.R. Evid. provides:

(a) **Comment or inference permitted.** The claim of a privilege by a party in a civil action or proceeding, whether in the present proceeding or upon a prior occasion, is

motion to strike. Given the passage of time and the progression of events, Subilia's decision concerning whether to testify, or his ability to invoke his Fifth Amendment rights, might now be different, a situation he strongly suggests in his brief to this Court. Under any of these scenarios, we would have a more fully-developed record on which to decide the ultimate issue following the entry of a final judgment. Of course no one knows what will happen at trial, which is the point of the final judgment rule.

[¶ 18] Our decision in *Estate of Markheim v. Markheim,* advanced by Subilia, is readily distinguishable. In that case, we accepted an interlocutory appeal pursuant to the death knell exception when the appellants unsuccessfully moved to disqualify opposing counsel who had both represented them in the past and had received relevant confidences during that representation. 2008 ME 138, ¶ 20, 957 A.2d at 61. We said that "[i]f we refuse to exercise our discretion to decide this issue before trial, the confidences and privileged information revealed in the course of the proceedings would become part of the record." *Id.* Similarly, the case of *Butler v. Romanova* involved information allegedly known to an attorney as a result of a claimed prior consultation with the moving party. 2008 ME 99, ¶ 2–8, 953 A.2d 748, 749–50.

[¶ 19] Here, the information that Subilia asserts is privileged has already been revealed, and is already part of the record. The danger of disclosure of confidential information known to an attorney as raised in the *Markheim* and *Butler* cases does not exist in this matter. The right of the moving parties in *Markheim* and *Butler* to prevent their previous attorneys from divulging confidential information is simply not present in the case at bar.

[¶ 20] Furthermore, although in *Markheim* and *Butler* we addressed in an interlocutory appeal the denial of a motion to disqualify an attorney, this result is clearly the exception, not the rule. While "[w]e have routinely held that an order *granting* a motion to disqualify an attorney is immediately appealable," *Markheim,* ¶ 15, 957 A.2d at 60 (emphasis in original), the same is not true for an order *denying* a motion to disqualify. When disqualification is denied:

> Recognizing that motions to disqualify counsel are sometimes used to delay proceedings, deprive the opposing party of counsel of its choice, and to harass and embarrass an opponent, we will undertake appellate review of decisions denying motions to disqualify before final judgment only when the particular facts demonstrate that a party's substantial rights may be irreparably lost if review is delayed until final judgment.

*Id.* ¶ 20, 957 A.2d at 61 (quotation marks omitted).

[¶ 21] We treat motions to disqualify that are granted differently from those that are denied for good reason. "We have determined that disqualifying an attorney involves a disadvantage and expense that cannot be remedied after the conclusion of the case." *Hurley v. Hurley,* 2007 ME 65, ¶ 6, 923 A.2d 908, 910 (quotation marks omitted). On the other hand, ordinarily no irreparable harm results from the denial of a motion to disqualify counsel. *See* Alexander, *Maine Appellate Practice* § 304(f) at 206. That is because, as in this case, if we determine on review following the entry of a final judgment that disqualification is required, then that action can occur prior to a new trial, and both parties would be put in the same

---

a proper subject of comment by judge or counsel. An appropriate inference may be

drawn therefrom.

position that they would have been in if disqualification occurred following an interlocutory appeal.

[¶ 22]   Moreover, beyond the impact on individual parties, a blanket exception to the final judgment rule allowing the denial of a motion to disqualify to be immediately appealed would allow any appellant to force us to prematurely review issues that would otherwise have to wait for the complete record that accompanies a final judgment.   This case is a good example of that danger.

[¶ 23]   Ordinarily, for the reasons already discussed, we would review Subilia's claim of attorney-client privilege following a trial.   However, Subilia argues that FMI's attorneys must be disqualified because the privilege was violated.   If, in every case, we treated the denial of a motion to disqualify as we treat an order granting disqualification, we would be compelled to reach the merits of Subilia's privilege claim in order to determine if disqualification is required.   In the same way, by linking substantive claims to a motion to disqualify counsel, any party could force us to reach claims in an interlocutory appeal that we would otherwise defer to post-trial review.   This approach and practice would eviscerate our well-established final judgment rule.

[¶ 24]   Because Subilia has suffered no irreparable loss of his substantial rights,[5] the death knell exception is inapplicable to this appeal, and we do not reach his premature claim that the Verrill Dana memo was protected by attorney-client privilege, or his assertion that the trial court improperly denied his motion to disqualify FMI's counsel.

### 2.   Collateral Order Exception

[¶ 25]   The collateral order exception applies when the appellant can establish that "(1) the decision is a final determination of a claim separable from the gravamen of the litigation;   (2) it presents a major unsettled question of law;   and (3) it would result in irreparable loss of the rights claimed, absent immediate review."   *Carter*, 2002 ME 103, ¶ 8, 799 A.2d at 1234.   For the reasons just discussed, we conclude that the third requirement is not satisfied.

### 3.   Judicial Economy Exception

[¶ 26]   The judicial economy exception "is available in those rare cases in which appellate review of a non-final order can establish a final, or practically final, disposition of the entire litigation."   *Id.* ¶ 13, 799 A.2d at 1236 (quotation marks omitted).   It applies "only when a decision on the appeal ... regardless of what it is, would effectively dispose of the entire case."   *Id.*   Here, there is no indication that Subilia will capitulate on FMI's claims or abandon his counterclaim if the trial court's ruling stands.   Conversely, even if Subilia prevailed at this stage, the Verrill Dana memo comprises only a small part of FMI's claims against him, meaning that in all likelihood the suit would go forward regardless of how we decided this issue.

### B.   Treatment of the Verrill Dana Memo

[¶ 27]   Although we dismiss this interlocutory appeal, having concluded that no exception to the final judgment rule applies, the record impels us to address the treatment of the Verrill Dana memo by

---

**5.**   "The cost and delay of litigating the claims ... which appellants cite as a justification for their death knell exception claim, does not qualify as a loss of substantial rights or permanent foreclosure of relief.   If it were otherwise, and the cost of further litigation alone justified interlocutory appeals, a further cost of litigation exception would swallow the final judgment rule, opening every interlocutory ruling to appeal."   *Dairyland Ins. Co. v. Christensen*, 1999 ME 160, ¶ 8, 740 A.2d 43, 45.

FMI's in-house counsel and current attorneys.

[¶ 28] In its order denying Subilia's motions to strike and to disqualify, the Business & Consumer Court said:

[T]he court would like to address the manner in which the issue of the Attorney–Client privilege was presented to this court—specifically, the decision by plaintiff's counsel to include information and quotes from the [Verrill Dana] legal opinion in the complaint even though the outcome of the confidentiality issue was not yet certain and in spite of the importance of the privilege that was at stake. Although the court has concluded that the opinion was not a privileged communication, its inclusion in the court record was not necessary to sustain the allegations of the complaint. Rather, its inclusion appears more to be an unnecessary act of brinksmanship regarding traditionally guarded communications in a highly revered relationship.

[¶ 29] The trial court's observations are well founded. Presented with an obvious and important ethical issue in this uncharted area of the law in Maine, Attorney Beedy was right to seek guidance from all possible sources before deciding what to do with a memo from a law firm stamped "ATTORNEY/CLIENT PRIVILEGE." Having appropriately sought an advisory opinion from Bar Counsel, one of the best sources of ethical advice for Maine attorneys, prudence and good practice would strongly suggest obtaining an affirmative answer before embarking upon a potentially risky course of action. It seems equally evident that, having just delivered the memo to FMI officials, a reasonable attorney would return Bar Counsel's phone call to get an expert opinion before a potential legal case progressed. Attorneys do not act more ethically by avoiding relevant but potentially unwelcome information.

[¶ 30] Once the suit was filed, FMI's current attorneys' treatment of the disputed memo reflected a dismissive attitude and preemptive approach to Subilia's claim of privilege. As the trial court noted, at the point that FMI quoted portions of the memo in its complaint, and then attached the entire memo to its response to Subilia's motions, thus making it a matter of public record, no party or attorney could know with certainty how a court would resolve what is a matter of first impression in this State. We agree with the court when it said that this issue was better resolved by a motion in limine, a request for in camera review, or by some other procedural mechanism that did not expose the memo to a wide audience prior to any opportunity for judicial review.[6]

[¶ 31] The attorney-client privilege is well established in the law of this State and respected by the members of the Maine bar. Nothing in this Court's dismissal of this appeal should be interpreted as suggesting that the Court endorses or otherwise condones the approach taken by FMI's attorneys to the assertion of the privilege in these proceedings.

The entry is:

Appeal dismissed.

---

6. Maine Rule of Professional Conduct 4.4(b), which takes effect August 1, 2009, governs the treatment of writings that a lawyer "has reasonable cause to believe ... may have been inadvertently disclosed and contain confidential information or be subject to a claim of privilege." In part, the rule states that: "The recipient may not use or disclose the information in the writing until the claim is resolved, formally or informally. The sending or receiving lawyer may promptly present the writing to a tribunal under seal for a determination of the claim."

ALEXANDER, J., concurring.

[¶ 32] I concur in and join that portion of the Court's opinion that dismisses the appeal as interlocutory without reaching the merits. I do not join in part II(B) of the Court's opinion that criticizes the actions of Fiber Materials, Inc.'s in-house counsel and trial counsel in disclosing the contents of the Verrill Dana memo.

[¶ 33] The record reflects that this memo was sent to Maurice Subilia at his FMI business e-mail address and received by and stored on a computer owned by FMI. The record further reflects that Subilia was fully aware of, and had instructed other employees regarding, FMI's computer and e-mail policies which stated that, as to FMI: (1) any right or expectation of privacy is waived; (2) business e-mails are not confidential and are subject to review and monitoring by FMI; and (3) FMI computers, and anything stored on such computers, are the property of and reviewable by FMI.

[¶ 34] Being fully cognizant of such policies, Subilia accepted the risk that the Verrill Dana memo, sent to his business e-mail and placed on his business computer, might become known to FMI. At this stage of the proceedings, when we are not reaching the merits of the appeal, it is reasonably arguable that reviewing and disclosing the contents of a document that, according to the FMI computer policy was not confidential as to FMI, did not amount to violation of an ethical rule. The computer contents ownership and e-mail access policies of FMI upon which FMI counsel acted, are hardly unique. They appear quite similar, for example, to computer and e-mail access policies of Maine State government, including the courts.

[¶ 35] Although it is reasonably arguable that no ethical violation occurred, the Court criticizes FMI counsel for not exercising greater caution "in this uncharted area of the law in Maine." But the law the Court is referencing is law regarding accidental disclosure of privileged documents to another party in a court action. A court rule relating to inadvertent disclosures of privileged material, M.R. Civ. P. 26(b)(5)(B), was adopted, effective July 1, 2008. This rule was based on our opinion in *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 19, 742 A.2d 933, 941. The new Maine Rule of Professional Conduct 4.4, effective August 1, 2009, also addresses inadvertent disclosure of privileged or protected material.

[¶ 36] These rules are all based on the premise that a disclosure of privileged material is inadvertent. However, here it appears that the disclosure may have been ill considered but was not inadvertent. The Verrill Dana memo related to FMI's business. It was sent to Subilia, an FMI employee, through the FMI e-mail and placed on his FMI-owned computer. At the time, Subilia was aware of the policies that there was no right or expectation of privacy in the contents of e-mails and files on FMI computers. Considering those policies, the FMI attorneys could have reasonably believed that the memo could be read and disclosed by FMI.

[¶ 37] Because there is a reasonable argument to be made that in-house and trial counsel for FMI committed no impropriety in receiving, reviewing, and disclosing the contents of the Verrill Dana memo in litigation with its former corporate officer, the Court, in dismissing this appeal as interlocutory, should not criticize conduct that, upon fuller examination, may be viewed as having violated no ethical rules.